## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

RICARDO ORTIZ-RIVERA,

               Plaintiff,

    v.

KILOLO KIZAKAZI,

               Defendant.

CIVIL ACTION NO. 3:21-CV-02134

(MEHALCHICK, M.J.)

### MEMORANDUM

Plaintiff Ricardo Ortiz-Rivera ("Ortiz-Rivera") brings this action pursuant to the Social Security Act, 42 U.S.C. § 405(g), for judicial review of the final decision of the Commissioner of Social Security (the "Commissioner") denying him application for disability insurance benefits under Title II of the Social Security Act. (Doc. 1). On March 7, 2022, the parties consented to proceed before the undersigned United States Magistrate Judge pursuant to Fed. R. Civ. P. 73 and 28 U.S.C. § 636(c). (Doc. 11). For the following reasons, the Commissioner's decision will be **AFFIRMED**.

I. **BACKGROUND AND PROCEDURAL HISTORY**

On July 10, 2017, Ortiz-Rivera protectively filed applications for Title II disability insurance benefits, claiming disability beginning September 9, 2016. (Doc. 13-3, at 19). The Social Security Administration ("SSA") initially denied his application on August 15, 2017. (Doc. 13-3, at 19). On August 30, 2017, Ortiz-Rivera filed a request for a hearing, which Administrative Law Judge ("ALJ") Richard Zack held on October 22, 2018. (Doc. 13-3, at 19). In a written opinion dated December 5, 2018, ALJ Zack determined that Ortiz-Rivera "has not been under a disability, as defined in the Social Security Act from September 9, 2016, through the date of this decision," and therefore not entitled to benefits under Title II. (Doc.

13-3, at 29). On April 1, 2020, the Appeals Council granted Ortiz-Rivera's request for review, vacating the hearing decision and remanding the case to an ALJ for reconsideration. (Doc. 13-3, at 33). The Appeals Council found that ALJ Zack failed to evaluate the medical source opinion by Sumnet Sandhu, M.D. ("Dr. Sandhu"). (Doc. 13-3, at 35). In the remand order, the Appeals Council directed the ALJ to:

- Obtain additional evidence concerning [Ortiz-Rivera]'s impairments in order to complete the administrative record in accordance with the regulatory standards regarding consultative examinations and existing medical evidence (20 CFR 404.1512). The additional evidence may include, if warranted and available, a consultative psychiatric examination and medical source opinions about what [Ortiz-Rivera] ca still do despite the impairments.

- Give further consideration to [Ortiz-Rivera]'s maximum residual functional capacity during the entire period at issue and provide rationale with specific references to evidence of record in support of assessed limitations (Social Security Ruling 96-8p). in so doing, evaluate the medical source opinion(s) pursuant to the provisions of 20 CFR 404.1520c. as appropriate, the [ALJ] may request the medical source provide additional evidence and/or further clarification of the opinion (0 CFR 404.1520b). The [ALJ] may enlist the aid and cooperation of [Ortiz-Rivera]'s representative in developing evidence from [Ortiz-Rivera]'s medical source.

- If warranted by the expanded record, obtain evidence from a vocational expert to clarify the effect of the assessed limitations on [Ortiz-Rivera]'s occupational base (Social Security Rulings 83-14 and 85-15). The hypothetical questions should reflect the specific capacity/limitations established by the record as a whole. The [ALJ] will ask the vocational expert to identify examples of appropriate jobs and to state the incidence of such jobs in the national economy (20 CFR 404.1566). Further, before relying on the vocational expert evidence the [ALJ] will identify and resolve any conflicts between the occupational evidence provided by the vocational expert and information in the Dictionary of Occupational Titled (DOT) and its companion publication, the Selected Characteristics of Occupations (Social Security 00-4p).

(Doc. 13-3, at 35-36).

On remand, ALJ Frank Barletta held a telephonic hearing on October 5, 2020, and a

supplemental hearing on February 10, 2021, where Ortiz-Rivera's representative questioned the vocational expert regarding her answers to interrogatories presented by ALJ Barletta. (Doc. 13-2, at 29). In a written opinion dated March 29, 2021, ALJ Barletta determined that Ortiz-Rivera "was not under a disability, as defined in the Social Security Act, at any time from September 9, 2016, the alleged onset date, through June 30, 2020, the last date insured," and therefore not entitled to benefits under Title II. (Doc. 13-2, at 51). On October 19, 2021, the Appeals Council denied Ortiz-Rivera's request for review. (Doc. 13-2, at 2).

On December 20, 2021, Ortiz-Rivera filed the instant complaint. (Doc. 1). The Commissioner responded on March 10, 2022, providing an answer and the requisite transcripts from Ortiz-Rivera's disability proceedings. (Doc. 12; Doc. 13). The parties then filed their respective briefs, with Ortiz-Rivera raising four bases for reversal or remand. (Doc. 14; Doc. 18; Doc. 20).

## II.   STANDARDS OF REVIEW

To receive benefits under Title II of the Social Security Act, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To satisfy this requirement, a claimant must have a severe physical or mental impairment that makes it impossible to do his or her previous work or any other substantial gainful activity that exists in significant numbers in the national economy. 42 U.S.C. § 423(d)(2)(A); 20 C.F.R. § 404.1505(a).[1] Additionally, to be eligible to

---

[1] A "physical or mental impairment" is defined as an impairment resulting from

receive benefits under Title II of the Social Security Act, a claimant must be insured for disability insurance benefits. 42 U.S.C. § 423(a)(1)(a); 20 C.F.R. § 404.131.

### A. ADMINISTRATIVE REVIEW

In evaluating whether a claimant is disabled, the "Social Security Administration, working through ALJs, decides whether a claimant is disabled by following a now familiar five-step analysis." *Hess v. Comm'r Soc. Sec.*, 931 F.3d 198, 200–01 (3d Cir. 2019). The "burden of proof is on the claimant at all steps except step five, where the burden is on the Commissioner of Social Security." *Hess*, 931 F.3d at 201; 20 C.F.R. § 404.1512(a)(1). Thus, if the claimant establishes an inability to do past relevant work at step four, the burden shifts to the Commissioner at step five to show that jobs exist in significant numbers in the national economy that the claimant could perform consistent with his or her residual functional capacity, age, education, and past work experience. 20 C.F.R. § 404.1512(a)(1).

### B. JUDICIAL REVIEW

The Court's review of a determination denying an application for benefits is limited "to considering whether the factual findings are supported by substantial evidence." *Katz v. Comm'r Soc. Sec.*, No. 19-1268, 2019 WL 6998150, at *1 (3d Cir. Dec. 20, 2019). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (internal quotation marks omitted). Substantial evidence is less than a preponderance of the evidence but more than a mere scintilla. *Richardson v.*

---

"anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3).

*Perales*, 402 U.S. 389, 401 (1971).

A single piece of evidence is not substantial if the ALJ ignores countervailing evidence or fails to resolve a conflict created by such evidence. *Mason v. Shalala*, 994 F.2d 1058, 1064 (3d Cir. 1993). In an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent [the ALJ's decision] from being supported by substantial evidence." *Consolo v. Fed. Maritime Comm'n*, 383 U.S. 607, 620 (1966). "In determining if the Commissioner's decision is supported by substantial evidence the court must scrutinize the record as a whole." *Leslie v. Barnhart*, 304 F. Supp. 2d 623, 627 (M.D. Pa. 2003).

The question before the Court, therefore, is not whether Ortiz-Rivera was disabled, but whether the Commissioner's determination that Ortiz-Rivera was not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law. *See Arnold v. Colvin*, No. 3:12-CV-02417, 2014 WL 940205, at *1 (M.D. Pa. Mar. 11, 2014) ("[I]t has been held that an ALJ's errors of law denote a lack of substantial evidence."); *Burton v. Schweiker*, 512 F. Supp. 913, 914 (W.D. Pa. 1981) ("The [Commissioner]'s determination as to the status of a claim requires the correct application of the law to the facts."); *see also Wright v. Sullivan*, 900 F.2d 675, 678 (3d Cir. 1990) (noting that the scope of review on legal matters is plenary). If "the ALJ's findings of fact . . . are supported by substantial evidence in the record," the Court is bound by those findings. *Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000).

III.   **THE ALJ'S DECISION**

In his written decision, ALJ Barletta determined that Ortiz-Rivera "was not under a disability, as defined in the Social Security Act, at any time from September 9, 2016, the alleged onset date, through June 30, 2020, the last date insured." (Doc. 13-2, at 50). The ALJ reached this conclusion after proceeding through the five-step sequential analysis required by the Social Security Act. *See* 20 C.F.R. § 404.1520(a)(4). At the outset, ALJ Barletta determined that Ortiz-Rivera met the insured status requirements of the Social Security Act on June 30, 2020. (Doc. 13-2, at 32).

A.   STEP ONE

At step one of the five-step analysis, the ALJ must determine whether the claimant is engaging in substantial gainful activity ("SGA"). 20 C.F.R. § 404.1520(a)(4)(i). If a claimant is engaging in SGA, the claimant is not disabled, regardless of age, education, or work experience. SGA is defined as work activity requiring significant physical or mental activity and resulting in pay or profit. 20 C.F.R. § 404.1520(b). In making this determination, the ALJ must consider only the earnings of the claimant. 20 C.F.R. § 404.1574. Here, ALJ Barletta determined that Ortiz-Rivera "did not engaged in substantial gainful activity during the period from his alleged onset sate of September 9, 2016 through his date last insured of June 30, 2020." (Doc. 13-2, at 32). Thus, the ALJ's analysis proceeded to step two.

B.   STEP TWO

At step two, the ALJ must determine whether the claimant has a medically determinable impairment, or combination of impairments, that is severe and meets the 12-month duration requirement. 20 C.F.R. § 404.1520(a)(4)(ii). If the ALJ determines that the claimant does not have an impairment or combination of impairments that significantly limits

his or her "physical or mental ability to do basic work activities," the ALJ will find that the claimant does not have a severe impairment and is therefore not disabled. 20 C.F.R. § 404.1520(c). If a claimant establishes a severe impairment or combination of impairments, the ALJ analysis continues to the third step. Here, ALJ Barletta concluded that Ortiz-Rivera had the following severe impairments: "congenital lumbar canal stenosis at L3-L5, lumbar radiculopathy, diabetes mellitus, obstructive sleep apnea, orthostatic hypotension, obesity, major depressive disorder, generalized anxiety disorder, panic disorder with agoraphobia, adjustment disorder with mixed anxiety and depressed mood, and intermittent explosive disorder." (Doc. 13-2, at 32). In addition, ALJ Barletta determined that Ortiz-Rivera had the following non-severe impairments: "hypertension, hyperlipidemia, dry eye syndrome, restless legs syndrome, gastroesophageal reflux disease (GERD), metabolic syndrome, hypertriglyceridemia, transaminitis, hepatic steatosis, and vitamin D insufficiency." (Doc. 13-2, at 32-33).

C.   STEP THREE

At step three, the ALJ must determine whether an impairment or combination of impairments meets or equals the medical equivalent of an impairment listed in the version of 20 C.F.R. Part 404, Subpt. P, App. 1 that was in effect on the date of the ALJ's decision. 20 C.F.R. §§ 404.1520(a)(4)(iii), 404.1525, 404.1526. The sections in this appendix are commonly referred to as "listings." If the ALJ determines that the claimant's impairments meet these listings, then the claimant is considered disabled. 20 C.F.R. § 404.1520(d). Otherwise, the ALJ must proceed to the fourth step of the analysis. 20 C.F.R. § 404.1520(d). Here, ALJ Barletta determined that none of Ortiz-Rivera's impairments, considered

individually or in combination, meet or equal the severity of a listed impairment. (Doc. 13-2, at 34). The ALJ considered the listings under sections 1.04 (Disorders of the spine), 3.00 (Sleep-related breathing disorders), 11.00 (Neurological disorders), 11.14 (Peripheral neuropathy), 12.04 (Depressive, bipolar and related disorders), 12.06 (Anxiety and obsessive-compulsive disorders), 12.08 (Personality and impulse-control disorders), 12.15 (Trauma- and stressor-related disorders), and Social Security Ruling 19-2p. (Doc. 13-2, at 34-38).

### D.   RESIDUAL FUNCTIONAL CAPACITY

Between steps three and four, the ALJ determines the claimant's residual functional capacity ("RFC"), crafted upon consideration of the evidence presented. At this intermediate step, the ALJ considers "all [the claimant's] symptoms . . . and the extent to which [the claimant's] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." 20 C.F.R. § 404.1529(a). This involves a two-step inquiry where the ALJ must (1) determine whether an underlying medically determinable mental impairment or impairments could reasonably be expected to produce the claimant's symptoms and, if so, (2) evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's functional limitations. *See* 20 C.F.R. § 404.1529(b)–(c).

Here, Ortiz-Rivera alleged that his impairments caused the following symptoms: strong rage, thoughts of suicide, problems with focusing and concentration, forgetfulness, pain in the lower back, vision problems, difficulty interacting with others, panic attacks, shortness of breath, difficulty remembering things, and problems with walking and sitting. (Doc. 13-2, at 39-40). ALJ Barletta found that while Ortiz-Rivera's medically determinable

impairments could reasonably be expected to cause the alleged symptoms, his statements concerning the intensity, persistence, and limiting effects of these symptoms were not entirely consistent with the medical evidence and other evidence in the record. (Doc. 13-2, at 40). The ALJ concluded that Ortiz-Rivera has the RFC "to perform light work as defined in 20 CFR 404.1567(b)," subject to the following non-exertional limitations:

> [Ortiz-Rivera] can occasionally balance, stoop, kneel, crouch, crawl, and climb ramps or stairs, but he can never climb ladders, ropes, nor scaffolds. He should avoid concentrated exposure to extreme cold and heat, humidity, dust, odors, fumes, poor ventilation and other pulmonary irritants, as well as all exposure to hazards and vibrations. [Ortiz-Rivera] is limited to unskilled work, with a reasoning level of one, involving only simple, routine tasks that are not performed in a fast-paced production environment. He would be limited to occupations with only occasional, simple decision-making and occasional changes in work duties or work setting. [Ortiz-Rivera] can tolerate only occasional interaction with supervisors, co-workers, and the public.

(Doc. 13-2, at 38-39).

E.   STEP FOUR

Having assessed a claimant's RFC, step four requires the ALJ to determine whether the claimant has the RFC to perform the requirements of his or her past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). A finding that the claimant can still perform past relevant work requires a determination that the claimant is not disabled. 20 C.F.R. § 404.1520(a)(4)(iv). Past relevant work is defined as work that the claimant has done within the past 15 years, that was substantial gainful activity, and that lasted long enough for the claimant to learn how to do it. 20 C.F.R. § 404.1560(b). "If the claimant can perform his [or her] past relevant work despite his [or her] limitations, he [or she] is not disabled." *Hess*, 931 F.3d at 202 (citing 20 C.F.R. § 404.1520(a)(4)(iv)). Here, ALJ Barletta found that through the date last insured, Ortiz-Rivera was unable to perform any past relevant work. (Doc. 13-2, at 49). The ALJ noted that Ortiz-

Rivera had past relevant work as an equipment operator, poultry picker, meat scanner, and meat stacker, but the requirements exceeded Ortiz-Rivera's RFC. (Doc. 13-2, at 49). Thus, the ALJ proceeded to step five of the sequential analysis.

    F.   S<small>TEP</small> F<small>IVE</small>

At step five of the sequential analysis process, the ALJ considers the claimant's age, education, and work experience to see if a claimant can make the adjustment to other work. 20 C.F.R. § 404.1520(a)(4)(v). These factors are not considered when evaluating a claimant's ability to perform past relevant work. 20 C.F.R. § 404.1560(b)(3). If a claimant can adjust to other work, he or she will not be considered disabled. 20 C.F.R. § 404.1520(a)(4)(v). Here, ALJ Barletta made vocational determinations that Ortiz-Rivera was 47 years old on the date last insured, which is defined as a younger individual age 18-49, with a limited education. (Doc. 13-2, at 49). Considering Ortiz-Rivera's age, education, work experience, and RFC, the ALJ determined that there are jobs that exist in significant numbers in the national economy that Ortiz-Rivera can perform. (Doc. 13-2, at 49). In making this determination, the ALJ relied on the expertise of the vocational expert, who testified that Ortiz-Rivera could perform the requirements of occupations such as a (1) bagger; (2) trimmer; and (3) inserter, which are occupations with open positions ranging from 13,000 to 672,000 nationally. (Doc. 13-2, at 50). Accordingly, the ALJ determined that Ortiz-Rivera has not been under a disability during the relevant period and denied his application for benefits. (Doc. 13-2, at 50-51).

IV.   **D<small>ISCUSSION</small>**

On appeal, Ortiz-Rivera advances four bases to argue that the decision of the ALJ is not supported by substantial evidence. (Doc. 14). First, Ortiz-Rivera argues remand is required because ALJ Barletta failed to include all mental limitations he found credible in his

RFC or to explain why he was omitting those credible limitations. (Doc. 14, at 4-6; Doc. 20, at 1-3). Second, Ortiz-Rivera avers that remand is required because the ALJ erred in substituting his lay judgment for the medical opinions of treating physicians Dr. Sandhu and Luke Piper, M.D. ("Dr. Piper"). (Doc. 14, a 6-10; Doc. 20, at 3-4). Third, Ortiz-Rivera contends the appointment of Andrew Saul as a single commissioner of the SSA, who was removable only for cause and would serve a longer term than that of the President, violates separation of powers. (Doc. 14, at 10-13; Doc. 20, at 4-8). Thus, Ortiz-Rivera argues the decision of the ALJ and Appeals Counsel judges, who derived their authority from Andrew Saul, is constitutionally defective because they were not properly appointed under the Constitution. (Doc. 14, at 13-14). In response, the Commissioner maintains that substantial evidence supports the ALJ's decision and that Ortiz-Rivera is not entitled to a remand for a new hearing because his separation of powers argument fails. (Doc. 18).

A.   SUBSTANTIAL EVIDENCE SUPPORTS THE ALJ'S EVALUATION OF OPINION EVIDENCE.

Ortiz-Rivera contends the ALJ erred in his evaluation of the medical opinion evidence and limitations assessed by Dr. Sandhu and Dr. Piper. (Doc. 14, at 4-10; Doc. 20, at 1-4). In opposition, the Commissioner argues that ALJ Barletta "evaluated the persuasiveness of the medical opinions in accordance with the regulations, and then made factual findings that enjoy the support of substantial evidence." (Doc. 18, at 46-47).

Assessing a claimant's RFC falls within the purview of the ALJ. 20 C.F.R. § 404.1546(c); SSR 96-8p, 1996 WL 374184 (S.S.A. July 2, 1996). "[RFC] is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s).'" *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 121 (3d Cir. 2000) (quoting

*Hartranft v. Apfel*, 181 F.3d 358, 359 (3d Cir. 1999)). Specifically, one's RFC reflects the most that an individual can still do, despite his or her limitations, and is used at steps four and five to evaluate the claimant's case. 20 C.F.R. §§ 404.1520, 404.1545; SSR 96-8P, 1996 WL 374184 at *2. In crafting the RFC, the ALJ must consider all the evidence of record, including medical signs and laboratory findings, daily activities, medical source statements, and a claimant's medical history. SSR 96-8p, 1996 WL 374184, at *5; *see also Mullin v. Apfel*, 79 F. Supp. 2d 544, 548 (E.D. Pa. 2000). An ALJ's RFC findings, however, must be supported by the medical evidence. *Doak v. Heckler*, 790 F.2d 26, 28 (3d Cir. 1986). "[O]nce the ALJ has made this [RFC] determination, [a court's] review of the ALJ's assessment of the plaintiff's RFC is deferential, and that RFC assessment will not be set aside if it is supported by substantial evidence." *Black v. Berryhill*, No. 16-1768, 2018 WL 4189661 at *3 (M.D. Pa. Apr. 13, 2018).

In *Cotter v. Harris*, the Circuit Court clarified that the ALJ must not only state the evidence considered which supports the result but also indicate what evidence was rejected: "Since it is apparent that the ALJ cannot reject evidence for no reason or the wrong reason, an explanation from the ALJ of the reason why probative evidence has been rejected is required so that a reviewing court can determine whether the reasons for rejection were improper." 642 F.2d 700, 704, 706-707 (3d Cir. 1981). However, the ALJ need not undertake an exhaustive discussion of all the evidence. *See, e.g., Knepp*, 204 F.3d at 83. "There is no requirement that the ALJ discuss in her opinion every tidbit of evidence included in the record." *Hur v. Barnhart*, 94 F. App'x 130, 133 (3d Cir. 2004).

As this matter involves a claim filed after March 27, 2017, the new regulatory framework governing the evaluation of medical opinions applies to the ALJ's evaluation of the medical opinions in the record. *See* Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844 (Jan. 18, 2017) (technical errors corrected by 82 Fed. Reg. 15,132-01 (Mar. 27, 2017)); *see also* 82 Fed. Reg. 15263 (March 27, 2017); 82 Fed. Reg. 16869 (corrective notice) (explaining that SSR 96-2p and 96- 5p do not apply to newly filed or pending claims after March 27, 2017). Under the new regulations, rather than assigning weight to medical opinions, the Commissioner will articulate "how persuasive" he or she finds the medical opinions. 20 C.F.R. § 404.1520c(b). The Commissioner's consideration of medical opinions is guided by the following factors: supportability; consistency; relationship with the claimant (including the length of the treatment relationship, the frequency of examinations, the purpose of the treatment relationship, the extent of the treatment relationship, and the examining relationship); specialization of the medical source; and any other factors that tend to support or contradict the opinion. 20 C.F.R. § 404.1520c(c). The most important of these factors is the "supportability" of the opinion and the "consistency" of the opinion. 20 C.F.R. § 404.1520c(b)(2).

The ALJ must explain how he or she considered the "supportability" and "consistency" of a medical source's opinion. 20 C.F.R. § 404.1520c(b)(2). Generally, the ALJ may, but is not required to, explain his or her consideration of the other factors, but if there are two equally persuasive medical opinions about the same issue that are not exactly the same, then the ALJ must explain how he or she considered the other factors. 20 C.F.R. § 404.1520c(b)(3). To facilitate judicial review, the ALJ's decision must be accompanied by "a

clear and satisfactory explication of the basis on which it rests" and the ALJ must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. *Cotter*, 642 F.2d at 704, 706-707. An ALJ need not undertake an exhaustive discussion of all the evidence or "use particular language or adhere to a particular format in conducting his analysis." *Jones v. Barnhart*, 364 F.3d 501, 505 (3d Cir. 2004); *see Hur*, 94 F. App'x at 133 ("There is no requirement that the ALJ discuss in his opinion every tidbit of evidence included in the record."). However, an ALJ must ensure "sufficient development of the record and explanation of findings to permit meaningful review." *Jones*, 364 F.3d at 505; *see, e.g., Rivera v. Comm'r of Soc. Sec.*, 164 F. App'x 260, 262 (3d Cir. 2006) ("The only requirement is that, reading the ALJ's decision as a whole, there must be sufficient development of the record and explanation of findings.").

As to Ortiz-Rivera's mental impairments, the ALJ acknowledged that the record should that Ortiz-Rivera exhibited symptoms of anxiety and depression, and received psychiatric care from January 2017 through September 2017, from March 2018 through September 2018, from September 2019 through November 2019, in March 2020, and from June 2020 through July 2020. (Doc. 13-2, at 44-45). However, the ALJ noted that "the nature, scope, and findings from his longitudinal treatment records are not supportive of the intensity or persistence of his subjective allegations, and these records are not supportive of more restrictive findings than adopted herein." (Doc. 13-2, at 48). Therefore, the ALJ contends the RFC "is supported by the medically adopted diagnostic techniques, clinical findings, level of treatment, activity level of [Ortiz-Rivera], and testimony of record." (Doc. 13-2, at 48-49).

- 14 -

On February 28, 2017, Dr. Sandhu completed a mental status supplemental questionnaire. (Doc. 13-7, at 2). In a psychiatric functional capabilities assessment, Dr. Sandhu opined that Ortiz-Rivera has mild limitations in the following functional abilities: understanding, remembering, and carrying out written instructions; responding appropriately to supervision; performing intellectually complex tasks requiring higher levels of reasoning and/or math and/or language skills; performing repetitive and varied tasks; making independent judgments; and supervising or managing others. (Doc. 13-7, at 4-5). In addition, Dr. Sandhu opined that Ortiz-Rivera has moderate limitations in the following functional abilities: avoiding physical danger; attending to personal care/activities of daily living; performing instrumental ADLs, e.g., cooking, household tasks, laundry, etc.; participating in previously valued activities; understanding, remembering, and carrying out simple and/or complex verbal instructions; and performing work requiring minimal intellectual effort. (Doc. 13-7, at 4-5). Lastly, Dr. Sandhu opined that Ortiz-Rivera has moderately severe limitations in the following functional abilities: managing funds, e.g., endorse checks and use the proceeds thereof; interacting with other people in a socially acceptable manner; performing work requiring regular contact with others; performing work where contact with others is minimal; performing under stress when confronted with emergency, critical, unusual or dangerous situations; and performing tasks in which speed and sustained attention are critical aspects. (Doc. 13-7, at 4-5).

On July 3, 2020, Ortiz-Rivera's treating psychiatrist, Dr. Piper, completed a mental impairment questionnaire. (Doc. 13-7, at 1835). Dr. Piper opined that Ortiz-Rivera would have difficulty working at a regular job on a sustained basis because he has a negative profile

that includes defects to motivation, energy, and drive, and would function suboptimally at a job. (Doc. 13-7, at 1838). In addition, Dr. Piper opined that Ortiz-Rivera has a moderate functional limitation in restriction of activities of daily living and a marked functional limitation in maintaining social functioning. (Doc. 13-7, at 1838). Dr. Piper opined that Ortiz-Rivera has a frequent functional limitation in concentrating, persisting, or pain resulting in failure to complete tasks in a timely manner in work settings and elsewhere, and has repeated episodes of deterioration or decompensation in work or work-like settings which cause him to withdraw from that situation or experience exacerbation of signs and symptoms. (Doc. 13-7, at 1838). Lastly, Dr. Piper noted that Ortiz-Rivera's psychiatric condition exacerbates his experience of fatigue and weakness, and Ortiz-Rivera's impairments would cause him to be absent from work more than three times a month. (Doc. 13-7, 1837).

The Court finds that the ALJ's evaluation of Dr. Sandhu's and Dr. Piper's opinions comported with the new regulatory scheme and is supported by substantial evidence. (Doc. 13-2, at 47). "Nothing in the Social Security Act or governing regulations requires the ALJ to obtain matching 'opinion' evidence in order to fashion a claimant's RFC." *Myers v. Berryhill*, 373 F. Supp. 3d 528, 538 (M.D. Pa. 2019). "[T]he ALJ is responsible for making an RFC determination ... and he is not required to seek a separate expert medical opinion." *Mays v. Barnhart*, 78 F. App'x 808, 813 (3d Cir. 2003); *see Butler v. Colvin*, 3:15-CV-1923, 2016 WL 2756268, at *13 n.6 (M.D. Pa. May 12, 2016) (rejecting the argument that a medical opinion is required to craft an RFC). "There is no legal requirement that a physician have made the particular findings that an ALJ adopts in the course of determining an RFC." *Titterington v. Barnhart*, 174 F. App'x 6, 11 (3d Cir. 2006). An ALJ "is not precluded from reaching RFC

determinations without outside medical expert review of each fact incorporated into the decision." *Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 362 (3d Cir. 2011). The ALJ is expressly not required to "seek outside expert assistance." *Chandler*, 667 F.3d at 362 (citing 20 C.F.R. §§ 404.1546(c), 404.1527(d), and SSR 96-5p).

Here, the ALJ found that Dr. Sandhu's opinion is persuasive. (Doc. 13-2, at 47). In evaluating the opinion of Dr. Sandhu, the ALJ determined its persuasiveness by considering both the consistency and supportability of the opinion. Regarding consistency, the ALJ explained that Dr. Sandhu's opinion "is consistent with [Ortiz-Rivera]'s treatment records, including his mental health records that noted an irritable and angry mood." (Doc. 13-2, at 47). Additionally, the ALJ articulated why the opinion was consistent with the record, noting that "[Ortiz-Rivera] reported passive thoughts of suicide without plan, further supporting Dr. Sandhu's opined limitations." (Doc. 13-2, at 47). Therefore, the ALJ's evaluation of the medical opinion of Dr. Sandhu comported with the Social Security Regulations. 20 C.F.R. §§ 404.1520c(b)(2).

Next, the ALJ found that Dr. Piper's opinion is "unpersuasive because Dr. Piper overestimated [Ortiz-Rivera]'s limitations." (Doc. 13-2, at 47). Although the ALJ did not use the terms "supportability" and "consistency," he explained that Dr. Piper's opinion is not supported by or consistent with the record because Ortiz-Rivera's "[m]ental status exams showed [his] memory was intact and his thought process was normal." (Doc. 13-2, at 47). In addition, the ALJ noted that the evidence of record indicates Ortiz-Rivera's "attention and concentration were normal and his insight and judgment were good." (Doc. 13-2, at 47). Furthermore, the ALJ explained "Dr. Piper's opinion that [Ortiz-Rivera] could manage his

benefits is in direct contract with his opinion that [Ortiz-Rivera] has repeated episodes of decompensation." (Doc. 13-2, at 47). Therefore, the ALJ's evaluation of the medical opinion of Dr. Piper comported with the Social Security Regulations. 20 C.F.R. §§ 404.1520c(b)(2).

Ortiz-Rivera argues that "[t]he ALJ's statement that Dr. Sandhu's opinion was persuasive but his failure to adopt all of the limitations offered by Dr. Sandhu renders his decision contradictory and fails to provide the logical bridge required for judicial review." (Doc. 14, at 6; Doc. 20, at 2). However, contrary to Ortiz-Rivera's argument, simply finding an opinion persuasive does not mean that the ALJ must accept the persuasive medical opinion wholesale. *See Wilkinson v. Commissioner of Social Security*, 558 Fed. App'x 254, 256 (3d Cir. 2014) (finding "no rule or regulation compels an ALJ to incorporate into an RFC every finding made by a medical source simply because the ALJ gave the source's opinion as a whole 'significant' weight."). Here, the ALJ accounted for Dr. Sandhu's opined moderately severe limitations in performing work requiring minimal or regular contact with others by stating Ortiz-Rivera's RFC determination is limited to "only occasional interaction with supervisors, co-workers, and the public." (Doc. 13-2, at 39). In addition, the ALJ accounted for the medical finding of moderately severe limitations in performing under stress and performing tasks in which speed and sustained attention are critical aspects by stating Ortiz-Rivera's RFC determination "is limited to unskilled work, with a reasoning level of one, involving only simple, routine tasks that are not performed in a fast-paced production environment," and "limited to occupations with only occasional, simple decision-making and occasional changes in work duties or work setting." (Doc. 13-2, at 39).

Although the ALJ accorded persuasive weight to Dr. Sandhu's opinion, the Court finds that the ALJ's RFC determination with respect to Ortiz-Rivera's mental limitations is supported by substantial evidence because the ALJ reviewed the medical record and other medical opinions and included only those mental limitations that were consistent with, and supported by, other medical opinions referenced in the ALJ's RFC determination. *See Bruce v. Kijakazi*, No. 3:20-CV-229, 2022 WL 973280, at *4 (W.D. Pa. Mar. 31, 2022) (affirming ALJ decision where ALJ accorded persuasive weight to medical opinion, but did not adopt all opined mental limitations). In sum, the ALJ was confronted by several medical opinions, which included varying limitations based on Ortiz-Rivera's mental impairments, and the ALJ's evaluation comported with the Social Security Regulations. 20 C.F.R. § 404.1520c(b)(2). Specifically, the ALJ considered the medical opinions of Dr. Sandhu and Dr. Piper against the objective medical evidence in the record and explained why weight was given to Dr. Sandhu's opinion and why he found the opinion of Dr. Piper inconsistent with or unsupported by the medical evidence. The ALJ is not required to explain additional factors.

The Court notes again that "[t]he ALJ – not treating or examining physicians or State agency consultants–must make the ultimate disability and RFC determinations." *Chandler*, 667 F.3d at 361. Moreover, the ALJ's evidentiary evaluation was supported by substantial evidence; that is, "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek*, 139 S. Ct. at 1154. Accordingly, the Court finds that the ALJ considered all of the medical evidence and adequately explained his reasoning for the weight given to the various medical opinions in this case to determine the range of work Ortiz-Rivera could perform.

- 19 -

B.  THE ALJ'S UNFAVORABLE DECISION IS NOT CONSTITUTIONALLY DEFECTIVE AND ORTIZ-RIVERA IS NOT ENTITLED TO A *DE NOVO* HEARING.

Next, Ortiz-Rivera argues that because the ALJ who adjudicated his claim, and/or Appeals Council members who considered her request for review, served under authority delegated from a Commissioner who enjoyed unconstitutional removal protection, the denial of his claim *ipso facto* violates the separation of powers. (Doc. 14, at 10-14; Doc. 20, at 4-9). First, Ortiz-Rivera argues the unfavorable decision by the ALJ and the Appeals Counsel was constitutionally defective because the Social Security Act provision that limits the President's authority to remove the Presidentially-appointed, Senate-confirmed Commission of Social Security without good cause, 42 U.S.C. § 902(a)(3), violates the separation of powers. (Doc. 14, at 10; Doc. 20, at 4). Thus, Ortiz-Rivera contends he is entitled to a remand for a new hearing. (Doc. 14, at 13; Doc. 20, at 7). Second, Ortiz-Rivera challenges the service of Acting Commissioner Nancy Berryhill under the Federal Vacancies Reform Act ("FVRA"), 5 U.S.C. 3346(a). (Doc. 14, at 13-14; Doc. 20, at 4-5). In opposition, the Commissioner states "[e]ven if [Nancy] Berryhill was not validly serving as Acting Commissioner when she ratified the appointment of SSA ALJs, [Ortiz-Rivera] is not automatically entitled to a new hearing." (Doc. 18, at 22). The Commissioner states "[t]he parties agree that 42 U.S.C. § 902(a)(3) violates the separation of powers to the extent it is construed as limiting the President's authority to remove the Commissioner without cause." (Doc. 18, at 27) (citing Office of Legal Counsel, U.S. Dep't of Justice, Constitutionality of the Commissioner of Social Security's Tenure Protection, 2021 WL 2981542 (July 8, 2021) ("OLC Op.")). However, the Commissioner argues that "without more, that conclusion does not support setting aside an unfavorable SSA disability benefits determination." (Doc. 18, at 22). After consideration of

- 20 -

the parties' arguments, the Court agrees with the rising tide of caselaw suggesting that there is no reversible error where a claimant has not shown a traceable injury linked to the unconstitutional removal clause. Accordingly, Ortiz-Rivera's argument is not a basis for a remand in this case.

In *Seila Law LLC v. CFPB*, 140 S. Ct. 2183 (2020), the Supreme Court held the Consumer Financial Protection Bureau's ("CFPB") removal structure, which allowed for the CFPB director to be removed by the President only for "inefficiency, neglect of duty, or malfeasance of office," 12 U.S.C. § 5491(c)(3), violated the separation of powers by insulating the director from removal by the President. *Seila Law*, 140 S. Ct. at 2197. The following year, in *Collins v. Yellen*, the Court held a provision limiting the President to remove the director of the Federal Housing Finance Agency ("FHFA") only for cause violated the separation of powers. 141 S. Ct. 1761, 1783 (2021) (holding that "Seila Law is all but dispositive"). Applying the holdings in *Seila Law* and *Collins* here makes it clear that the provision for removal of the Commissioner of Social Security, 42 U.S.C. § 902(a)(3), violates the separation of powers. *See Seila Law*, 140 S. Ct. at 2197; *Collins*, 141 S. Ct. at 1783. The Commissioner, a single officer at the head of an administrative agency, is removable only for cause. *See* 42 U.S.C. § 902(a)(3). This statutory clause suffers from the same defect as the removal provisions at issue in *Seila Law* and *Collins*, and thus violates the separation of powers. *See Seila Law*, 140 S. Ct. at 2197; *Collins*, 141 S. Ct. at 1783; *see also* Office of Legal Counsel, Constitutionality of the Comm'r of Soc. Sec.'s Tenure Protection, 2021 WL 2981542, at *7.

However, unlike Appointments Clause defects, where the presiding official does not enjoy proper authority to occupy the office, *see Lucia v. SEC*, 138 S. Ct. 2044 (2018), agency

action is not *per se* invalid simply because it can be traced back to an official subject to an unconstitutional *removal* protection. Rather, under *Collins*, where an agency official is properly appointed, there can be no claim that he "exercise[d] . . . power that [he] did not lawfully possess." *Collins*, 141 S. Ct. at 1788, 1788 n. 23 ("the unlawfulness of [a] removal provision does not strip [an official] of the power to undertake the other responsibilities of his office"). Thus, "there is no reason to regard *any* of the actions taken" by officials with tenure protection during this period "as void." *Collins*, 141 S. Ct. at 1787 (emphasis added); *see also Collins*, 141 S. Ct. at 1793 (Thomas, J., concurring) (where officials were properly appointed, there is "no barrier to them exercising power[.]"). Therefore, pursuant to *Collins*, actions taken by properly appointed officials are not void.

The Court also notes that in the recent Supreme Court decision in *Carter v. Saul*, 141 S. Ct. 1352 (2021), the Court resolved a Circuit split regarding the administrative exhaustion of an Appointments Clause challenge to the authority of an administrative law judge. The Court recognized its decision in Lucia v. SEC, 138 S. Ct. 2044 (2018), holding administrative law judges within the Securities and Exchange Commission had been unconstitutionally appointed in violation of the Appointments Clause. *Carr*, 141 S. Ct. at 1357. A violation of the Appointments Clause – ***not*** the separations of power clause – vacates the decision of an improperly appointed administrative law judge and requires a new review by a properly appointed adjudicator. *Carr*, 141 S. Ct. at 1357. The question for the Court in *Carr* is whether a claimant must raise an Appointment Clause challenge to an administrative law judge or the Appeals Council in a Social Security proceeding. The Court held there is no administrative exhaustion requirement to an Appointments Clause challenge. *Carr*, 141 S. Ct. at 1358–62.

First, Ortiz-Rivera argues that the ALJ's decision is void because Commissioner Saul, who appointed the ALJ, was not properly appointed due to the unconstitutional removal statute. (Doc. 14, at 11; Doc. 20, at 5). However, "the removal provision does not render the Commissioner's appointment invalid and thus, does not automatically void the ALJ's actions under the Commissioner." *Stamm v. Kijakazi*, No. 3:20-cv-02273, 2021 WL 6197749, at *6 (M.D. Pa. Dec. 31, 2021) (citing *Collins*, 141 S. Ct. at 1787-88). In *Collins*, the Court found the defective removal procedure did not render the FHFA's actions void from the outset. 141 S. Ct. at 1787 ("Although the statute unconstitutionally limited the President's authority to remove the confirmed Directors, there was no constitutional defect in the statutorily prescribed method of appointment to that office. As a result, there is no reason to regard any of the actions taken by the FHFA [challenged on appeal] as void."). Here, the ALJ who denied Ortiz-Rivera's disability claim "held office under an appointment ratified in July 2018 by then-Acting Commissioner Nancy Berryhill," who, unlike a Presidentially appointed, Senate-confirmed Commissioner, "enjoyed no statutory tenure protection," pursuant to Section 902(a)(3). (Doc. 18, at 29 n.10). Rather, the ALJ was appointed by an Acting Commissioner of Social Security whom the President could remove at any time. (Doc. 18, at 29 n.10). Because an Acting Commissioner does not have the same removal restriction as the Commissioner and because the ALJ was properly appointed, Ortiz-Rivera's argument is not persuasive in this case. *See Collins*, 141 S. Ct. at 1781 (because removal restrictions of the FHFA applied only to the Director, "any constitutional defect in the provision restricting the removal of a confirmed Director would not have harmed [the plaintiffs], and they would not be entitled to any relief" by actions of an Acting Director who enjoyed no such protections);

*see also Boger v. Kijakazi*, No. 1:20-CV-00331, 2021 WL 5023141, at *3 n.4 (W.D.N.C. Oct. 28, 2021) (finding that "Plaintiff's constitutional 'removal restriction' argument is likely not even applicable to this case because ALJ Howard was appointed by an Acting Commissioner of Social Security who could be removed from that office at the President's discretion.").[2]

Second, Ortiz-Rivera has not demonstrated that the unconstitutionality of 42 U.S.C. § 903(a)(3) inflicted compensable harm. *See Boger*, 2021 WL 5023141, at *3 (finding that the ALJ's decision was not constitutionally defective where "Plaintiff simply argues that all actions taken by the Commissioner – and in turn his appointed ALJ's – are void due to the unconstitutional removal provision[,]" but "offers no evidence to show that there is a nexus between the unconstitutional removal restriction and the denial of his application for disability benefits"); *see also Robinson v. Kijakazi*, No. 1:20-CV-00358, 2021 WL 4998397, at *3 (W.D.N.C. Oct. 27, 2021) (same); *Amanda B. v. Comm'r of Soc. Sec.*, No. 3:20-CV-00434, 2021 WL 4993944, at *9-10 (D. Or. Oct. 26, 2021) (concluding that "the authorities cited by Plaintiff in her supplemental briefing do not affect the disposition of this matter" where plaintiff "does not allege 'the SSA Commissioner took any action that is in any way related to the ALJ's decision' or the decision by the Appeals Council.").

---

[2] Other courts determining the issue of traceability for purposes of jurisdiction have disagreed with this position as it relates to the SSA. *See Dante v. Saul*, No. 20-CV-0702, 2021 WL 2936576, at *8 (D.N.M. July 13, 2021) (finding that "the plain language of § 902(a) suggests that the Presidential removal restrictions may apply not only to a Senate-confirmed Commissioner, but also to any individual serving in the office of Commissioner, including an Acting Commissioner"), *but see Collins*, 141 S. Ct. at 1783 (noting that "we generally presume that the President holds the power to remove at will executive officers and that a statute must contain 'plain language to take [that power] away'" when discussing whether an acting director is a confirmed director) (quoting *Shurtleff v. U.S.*, 189 U.S. 311, 316 (1903)).

In *Collins*, the Court found it was "possible for an unconstitutional provision to inflict compensable harm," and remanded to the lower court to determine whether the removal provision "inflicted harm." 141 S. Ct. at 1788-89. In that case, the action challenged by the plaintiffs was the directors' adoption and implementation of an amendment (the "Third Amendment") to certain financial agreements that "materially changed the nature of the agreements" and resulted in the companies in which plaintiffs were shareholders transferring to the U.S. Treasury "at least $124 billion dollars more than the companies would have had to pay" under the prior form of the agreements. *Collins*, 141 S. Ct. at 1774. The Third Amendment was not subject to full judicial review and the Supreme Court thus found that fact-finding by the lower courts was required in order to determine whether plaintiffs suffered harm directly as a result of the FHFA director's unconstitutional tenure protection. *Collins*, 141 S. Ct. at 1785, 1789. Relief is available in removal challenges only where officials subject to the challenged removal restrictions cause the alleged injuries, and where those restrictions themselves caused "compensable harm" upon plaintiffs. *Collins*, 141 S. Ct. at 1789.

Following *Collins*, many courts in this circuit have found that Social Security plaintiffs do not have standing to make a separation of powers challenge because they cannot show a nexus between the unconstitutional removal provision and some compensable harm. *See e.g., Jones v. Kijakazi*, No. 20-CV-1074, 2022 WL 1016610, at *12 (D. Del. April 5, 2022) ("Plaintiff does not articulate how the President's inability to remove the Commissioner without cause affected the ALJ's disability determination in this case"); *Adams v. Kijakazi*, No. 20-CV-3591, 2022 WL 767806, at * 11 (E.D. Pa. Mar. 14, 2022) ("Plaintiff has failed to establish any nexus between the removal restriction and the denial of her application for benefits"); *Kowalski v.*

*Kijakazi*, No. 3:20-CV-01783, 2022 WL 526094, at *11 (M.D. Pa. Feb. 22, 2022) ("There is no allegation suggesting a direct nexus between the adjudication of Kowalski's disability claim by the ALJ and the alleged separation of powers violation in the removal statute that applies to the Commissioner"); *Mor v. Kijakazi*, No. CV 21-1730, 2022 WL 73510, at *5 (D.N.J. Jan. 7, 2022) ("Plaintiff fails to point to any connection between the Commissioner's removal under Section 902(a)(3) and the ALJ's decision (or any other action in this case). As a result, the requisite nexus is not met").

In this case, the action challenged by Ortiz-Rivera is the ALJ's decision to deny benefits. (Doc. 14, at 10-11; Doc. 20, at 7). Ortiz-Rivera has alleged no direct action by former Commissioner Andrew Saul and no involvement—or even awareness—by the former President in the ALJ's decision. *Cf. Collins*, 141 S. Ct. at 1802 (Kagan, J. concurring) ("[G]iven the majority's remedial analysis, I doubt the mass of SSA decisions—which would not concern the President at all—would need to be undone. When an agency decision would not capture a President's attention, his removal authority could not make a difference."). Ortiz-Rivera cannot show how the President's supposed inability to remove the Commissioner without cause might have affected any ALJ's disability benefits decision, much less the decision on his specific claim. As the Commissioner points out in the brief in opposition, holding Ortiz-Rivera to a lower bar would provide him an "unwarranted remedial windfall," in which many thousands of other disappointed claimants could receive the same relief. (Doc. 18, at 24). Further, Ortiz-Rivera has made no clear allegation that Commissioner Saul's unconstitutional tenure resulted in compensable harm to him. The ALJ's decision was based upon an uncontested factual record and the application of established law, including case law,

- 26 -

which generally cannot be changed by the Commissioner. (Doc. 13-2, at 29-51). There is no allegation suggesting a direct nexus between the adjudication of Ortiz-Rivera's disability claim by the ALJ and the alleged separation of powers violation in the removal statute that applies to the Commissioner. Ortiz-Rivera's allegations merely express general dissatisfaction with the outcome of the adjudication of his disability claim.

Lastly, as the Commissioner notes, several constitutional remedial doctrines support the denial of Ortiz-Rivera's request for a rehearing. (Doc. 18, at 35). "The harmless error doctrine dictates that retrospective relief is only appropriate where a statutory provision that violates the Constitution caused the plaintiff some harm." *Kowalski*, 2022 WL 526094, at *12. Here, because Ortiz-Rivera cannot show that the Commissioner's tenure protection affected the ALJ's decision on his claim, his request for rehearing is denied. Next, "[t]he de facto doctrine springs from the fear of the chaos that would result from multiple and repetitious suits challenging every action taken by every official whose claim to office could be open to question, and seeks to protect the public by insuring the orderly functioning of the government despite technical defects in title to office." *Ryder v. United States*, 515 U.S. 177, 180 (1995). Here, however, the Commissioner's appointment and the appointment of the presiding ALJ were entirely proper. To hold otherwise would risk unwinding untold thousands of disability determinations, endangering the efficient and orderly adjudication of benefits by the Social Security Administration and harming the interests of those whose disability claims have yet to be adjudicated—precisely the type of "chaos" the de facto officer doctrine was designed to prevent. *Collins*, 141 S. Ct. at 1802 (Kagan, J., concurring). Third, the rule of necessity states that a judge must exercise adjudicatory responsibility over a matter, notwithstanding some

defect in his or her title or authority, where all other judges share the same defect. *See Philadelphia v. Fox*, 64 Pa. 169, 185 (Pa. 1870). Here, it could not have been an error for the deciding ALJ to hear Ortiz-Rivera's disability claim. If the Commissioner's tenure protection somehow filters down to affect one ALJ within the entire Social Security Administration, it affects all such ALJs. To hold that the assigned ALJ should have declined to adjudicate Ortiz-Rivera's claim for that reason would have meant that all other ALJs must decline to adjudicate as well for the same reason. Such widespread action would have left Ortiz-Rivera without a forum to adjudicate his claim and it would have denied him even the opportunity to qualify for benefits.

In the instant case, Ortiz-Rivera simply contends that he was not afforded a valid administrative adjudicatory process because the removal structure for the Commissioner of SSA is unconstitutional. (Doc. 14, at 10; Doc. 20, at 4). However, as recent caselaw illustrates, much more is needed than a generalized assertion that the unconstitutionality of the removal clause requires a remand. Rather, Ortiz-Rivera must show that the removal structure itself caused him harm. Ortiz-Rivera has not alleged any connection between the unconstitutional limit on the Commissioner of Social Security's removal and the ALJ's decision denying him benefits. *See Decker Coal Co. v. Pehringer*, 8 F.4th 1123, 1138 (9th Cir. 2021) ("[T]here is no link between the ALJ's decision awarding benefits and the allegedly unconstitutional removal provisions. And nothing commands us to vacate the decisions below on that ground."). Thus, while the removal clause in § 902(a)(3) violates the separation of powers, it does not independently require the Court to reverse the ALJ's decision absent a showing of compensable harm. Therefore, Ortiz-Rivera's first argument fails.

Ortiz-Rivera's second constitutionality argument is that the regulations under which the case was decided were unconstitutionally promulgated by Commissioner Saul because he was not properly appointed, due to 42 U.S.C. § 902(a)(3), and therefore did not have the power to promulgate them. (Doc. 14, at 11). As noted *supra,* Commissioner Saul was properly appointed such that he had "the authority to carry out the functions of the office." *Collins*, 141 S. Ct. at 1788. Therefore, this inquiry turns on whether promulgating regulations was a function of the office of Commissioner of Social Security. It was. 42 U.S.C. § 902(a)(4)-(5) provides "[t]he Commissioner may prescribe such rules and regulations as the Commissioner determines necessary or appropriate to carry out the functions of the Administration." 42 U.S.C. § 902(a)(4)-(5). Therefore, Ortiz-Rivera's second argument is rejected.

Ortiz-Rivera's third constitutionality argument is that this case must be remanded to a newly, properly appointed ALJ for a *de novo* hearing on the grounds that Berryhill's service as Acting Commissioner after November 17, 2017, violates the FVRA and, therefore, that appointment of SSA's ALJs and Appeals Council judges are void. (Doc. 14, at 13; Doc. 20, at 4-6). In support of his argument that all of the actions as Acting Commissioner taken by Berryhill after November 16, 2017, were unlawful, Ortiz-Rivera requests that the Court adopt the decision in *Brian T.D. v. Kijakazi*, 580 F.Supp.3d (D. Minn. Jan. 20, 2022). (Doc. 14, at 13; Doc. 20, at 4). In opposition, the Commissioner asserts that the Court should reject Ortiz-Rivera's argument because *Brian T.D.* is an outlier that conflicts with the plain text of the FVRA. (Doc. 18, at 11). The Commissioner argues Berryhill was able to lawfully ratify and approve the appointment of SSA ALJs because 5 U.S.C. § 3346(a)(2) "contains a 'spring-back' provision that enabled Berryhill to resume her role as Acting Commissioner as of the

date that Andrew Saul was nominated for Commissioner in April 2018." (Doc. 18, at 13) (quoting *Thomas S. v. Comm'r*, No. C21-05213-MAT, 2022 WL 268844, at *3 (W.D. Wash. Jan. 28, 2022)).

Resolution of Ortiz-Rivera's third issue turns on interpretation of the FVRA, which:

> provides a framework for temporarily filling vacancies in offices for which presidential appointment and Senate confirmation ("PAS") is required. 5 U.S.C. § 3345 et seq. The operative provision of the FVRA, 5 U.S.C. § 3345, sets a default that if a PAS official "dies, resigns, or is otherwise unable to perform the functions and duties of the office," then "the first assistant to the office of such officer shall perform the functions and duties of the office temporarily in an acting capacity subject to the time limitations of section 3346." Id. § 3345(a)(1). Otherwise, "the President (and only the President)" may fill vacant PAS offices on a temporary, acting basis with certain other federal officers. Id. § 3345(a)(2)– (a)(3).... The FVRA is the "exclusive means for temporarily authorizing an acting official to perform the functions and duties of any" PAS officer, unless another statute "expressly" creates an alternative mechanism for filling vacancies in a given agency. Id. § 3347. And violations of the FVRA have consequences: "An action taken by any person who is not acting" in compliance with the FVRA "in the performance of any function or duty of a vacant office to which" the FVRA applies "shall have no force and effect," id. § 3348(d)(1), and any such action "may not be ratified," id. § 3348(d)(2).

*Northwest Immigrant Rts. Project v. United States Citizenship & Immigr. Servs.*, 496 F.Supp.3d 31, 53 (D.D.C. 2020), appeal dismissed, No. 20-5369, 2021 WL 161666 (D.C. Cir. Jan. 12, 2021).

Relevant the present issue, the FVRA prescribes time limits for acting service in 5 U.S.C. § 3346. An acting official serving under the FVRA may serve "for no longer than 210 days beginning on the date the vacancy occurs; or . . . once a first or second nomination for the office is submitted to the Senate, from the date of such nomination for the period that the nomination is pending in the Senate." 5 U.S.C. § 3346(a)(1)-(2). For vacancies existing during the first 60 days after a Presidential transition, the 210-day period runs from the later of 90 days after inauguration or 90 days after the date of the vacancy. 5 U.S.C. § 3349a(b). If a first

- 30 -

nomination does not result in a confirmation, an acting official may serve for another 210 days, 5 U.S.C. § 3346(b)(1), and during the pendency of a second nomination, 5 U.S.C. § 3346(b)(2)(A). If the second nomination fails, then an acting official may serve for another 210 days. 5 U.S.C. § 3346(b)(2)(B). The FVRA also provides an enforcement provision 5 U.S.C. § 3348, which provides "[u]nless an officer or employee is performing the functions and duties in accordance with sections 3354, 3346, and 3347, . . . the office shall remain vacant [and] only the head of such Executive agency may perform any function or duty of such office." 5 U.S.C. § 3348(b)(1)-(2).

In December 2016, President Barack Obama issued a memorandum providing an order of succession within the SSA that listed the Deputy Commissioner of Operations ("DCO") as first in line to serve as Acting Commissioner in the case of vacancies in the positions of Commissioner and Deputy Commissioner. *See* "Memorandum Providing an Order of Succession Within the Social Security Administration," 81 Fed. Reg. 96337, 2016 WL 7487744 (Dec. 23, 2016) ("Succession Memo"). On January 20, 2017, Donald Trump assumed the Presidency, then-Acting Commissioner Carolyn Colvin resigned, and then-DCO Berryhill began serving as Acting Commissioner pursuant to the Succession Memo, as the offices of Commissioner and Deputy Commissioner remained vacant. *See* GAO Notice, at 1. On March 6, 2018, the GAO Notice reported that, pursuant to Section 3346(a)(1) of the FVRA, Berryhill's service as Acting Commissioner had expired on November 16, 2017. See GAO Notice, at 2.[3] Following the GAO Notice, Berryhill stepped down as Acting

---

[3] The FVRA added 90 days to the 210-day time limit for Berryhill to serve, because the Commissioner of SSA's vacancy began on President Trump's "transitional inauguration day" (January 20, 2017). 5 U.S.C. § 3349a(b)(1). Thus, November 16, 2017, constituted the 300th

Commissioner, but continued to lead the SSA as DCO. *See Patterson v. Berryhill*, No. 2:18CV193, 2018 WL 8367459, at *1 (W.D. Pa. June 14, 2018) (unpublished). On April 17, 2018, President Trump nominated Andrew Saul to the position of Commissioner of the SSA, an action which the SSA interpreted as permitting Berryhill to resume serving as Acting Commissioner as of that date under Section 3346(a)(2) of the FVRA, the so-called "spring-back" provision. *See Reuter v. Saul*, No. 19CV2053, 2020 WL 7222109, at *15 n.11 (N.D. Iowa May 29, 2020) (unpublished) (internal quotation marks omitted), *recommendation adopted*, 2020 WL 6161405 (N.D. Iowa Oct. 21, 2020) (unpublished).

On June 21, 2018, the United States Supreme Court issued *Lucia*, which held, based on its prior case *Freytag v. Comm'r of Int. Rev.*, 501 U.S. 868 (1991), that the SEC's ALJs qualified as "inferior Officers" subject to the Appointments Clause rather than federal employees, because they "h[e]ld a continuing office established by law" and "exercise[d] . . . significant discretion when carrying out . . . important functions." *Lucia*, 138 S. Ct. at 2053 (internal quotation marks omitted).[4] Because the SEC ALJ who decided the plaintiff's case lacked "the kind of appointment the [Appointments] Clause requires," i.e., appointment by the "President alone," "the Courts of Law," or "the Heads of Departments," U.S. Const. art.

---

day after the January 20th inauguration.

[4] The Appointments Clause provides as follows:

> [The President of the United States] shall nominate, and by and with the Advice and Consent of the Senate, shall appoint . . . Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law: but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments.

U.S. Const. art. II, § 2, cl. 2.

II, § 2, cl. 2, the Supreme Court "held that the appropriate remedy for an adjudication tainted with an appointments violation [wa]s a new hearing before a [different,] properly appointed official." *Lucia,* 138 S. Ct. at 2055 (internal quotation marks omitted).

Although "[*Lucia*] did not specifically address the constitutional status of ALJs who work in ... the [SSA, t]o address any Appointments Clause questions involving Social Security claims, and consistent with guidance from the [DOJ], on July 16, 2018[,] Berryhill ratified the appointments of [the SSA's] ALJs and approved those appointments as her own." Social Security Ruling 19-1p, Titles II and XVI: Effect of the Decision in *Lucia v. Securities and Exchange Commission (SEC) on Cases Pending at the Appeals Council*, 2019 WL 1324866, at *2 (Mar. 15, 2019) ("SSR 19-1p"). At the time Berryhill did so, she continued to use the title "Acting Commissioner of Social Security."

As noted *supra*, Ortiz-Rivera relies primarily on the reasoning in *Brian T.D. v. Kijakazi*, 580 F.Supp.3d 615 (D. Minn. 2022), to support his argument that Berryhill's ratification of the ALJ in this case on July 16, 2018, was statutorily ineffective. (Doc. 14, at 13; Doc. 20, at 4). In *Brian T.D.*, the court concluded that because Berryhill's initial 210-day acting service period lapsed before the submission of Saul's nomination in April 2018, Berryhill could not serve as Acting Commissioner during the pendency of Saul's nomination and thus could not lawfully ratify and approve the appointment of SSA ALJs as her own. 580 F.Supp.3d at 631-32.

Here, just as with any other question of statutory interpretation, the Court turns first to the FVRA and its text. *See Rotkiske v. Klemm*, 890 F.3d 422, 424-25 (3d Cir. 2018) (en banc), *aff'd*, 140 S. Ct. 355 (2019). First, the Court considers the statute's plain meaning. *See Burton*

*v. Schamp*, 25 F.4th 198, 207 (3d Cir. 2022). "This statutory language is unambiguous: the FVRA applies only to functions and duties that a PAS officer alone is permitted by statute or regulation to perform. It does not apply to delegable functions and duties." *Arthrex, Inc. v. Smith & Nephew, Inc.*, 35 F.4th 1328, 1336 (Fed. Cir. 2022). For the following reasons, the Court declines to adopt the decision in *Brian T.D.* and concludes that Berryhill properly served as Acting Commissioner under the spring-back provision of Section 3346(a)(2) at the time she ratified the appointments of the SSA's ALJs on July 16, 2018.

In *Brian T.D.*, the district court based its interpretation that 5 U.S.C. § 3346(a) precluded Berryhill from assuming a second term in office upon the submission of Saul's nomination on the following analysis of the meaning of the word "or":

> The word "or" modifies the entire provision that limits the acting officer to a period "no longer than" 210 days from the date the vacancy arose. Thus, when read with the entirety of subsection (a)(1) "or" serves to suspend that time limitation, not to create an entirely separate and distinct period of service. A person serving as an acting officer may do so "for no longer than 210 days beginning on the date the vacancy occurs; or ... once a first or second nomination for the office is submitted to the Senate," during the pendency of that nomination. *Id.* § 3346(a) (emphasis added). The ordinary usage of the word "or" is disjunctive, indicating an alternative. *United States v. Smith*, 35 F.3d 344, 346 (8th Cir. 1994).
>
> *Brian T.D.*, 580 F. Supp. 3d 615.

The Court finds that the decision in *Brian T.D.* errs in its interpretation of the word "or" at 5 U.S.C. § 3346(a) as finding the two alternatives mutually exclusive. The FVRA provides:

> (a) Except in the case of a vacancy caused by sickness, the person serving as an acting officer as described under section 3345 may serve in the office—
>
> > (1) for no longer than 210 days beginning on the date the vacancy occurs; or

- 34 -

> (2) subject to subsection (b), once a first or second nomination for the office is submitted to the Senate, from the date of such nomination for the period that the nomination is pending in the Senate.

5 U.S.C. § 3346 (emphasis added).

As the Commissioner argues:

> Section 3346(a) provides that an acting official who is serving under the FVRA may serve "for no longer than 210 days" from the date of the vacancy, "or," 5 U.S.C. § 3346(a)(1) (emphasis added), "once a first or second nomination for the office is submitted to the Senate . . . for the period that the nomination is pending in the Senate," *id.* § 3346(a)(2). By using the disjunctive "or," the FVRA provides for acting service during either or both of two periods: (1) for 210 days after the vacancy, or (2) during the pendency of a first or second nomination. And it provides a single trigger for permissible service during a first or second nomination's pendency: the submission of the nomination. Thus, under § 3346(a)(2)'s plain text, "once" Mr. Saul's "nomination for the office" of Commissioner "[wa]s submitted to the Senate," Ms. Berryhill could serve "for the period that the nomination [wa]s pending in the Senate." *Id.* § 3346(a)(2).

> The use of "or" to mean either one or both of two options is routine. "The word 'or' has an inclusive sense (A or B, or both) as well as an exclusive one (A or B, not both)." *Varga v. Colvin*, 794 F.3d 809, 815 (7th Cir. 2015). " 'The meaning of or is usually inclusive.' " *Tex. Std. Oil Co. v. Forest Oil Corp.*, No. 05-490, 2008 WL 11399510, at *4 (S.D. Tex. Jan. 3, 2008) (quoting Bryan A. Garner, *Dictionary of Modern Legal Usage* 624 (2d ed. 1995)). For example, if a server comes to a table and asks whether anyone would like "dessert or coffee," no one would interpret that to preclude ordering both.

(Doc. 18, at 12-13, 12 n.5).

Upon consideration of the plain text of Section 3346(a)(2), the Court is persuaded by

the reasoning set forth in *Brooks v. Kijakazi*, 2022 WL 2834345 (M.D.N.C. July 30, 2022):

> Here, the word "or" appears in a permissive sentence, i.e., "the person serving as an acting officer as described under section 3345 may serve in the office," 5 U.S.C. § 3346(a) (emphasis added), without qualifiers such as "either" and "but not both," *see id.* Accordingly, the Court should interpret the word "or" in Section 3346(a)(1) in its more common, inclusive sense to permit Berryhill, after serving as Acting Commissioner for 300 days following the vacancy under

Section 3346(a)(1), to spring back into that role upon Saul's nomination to the Senate under Section 3346(a)(2). *See N.L.R.B. v. SW Gen., Inc.*, —— U.S. ——, 137 S. Ct. 929, 939, 197 L.Ed.2d 263, (2017). . . Consistent with that view, the legislative history of the FVRA makes clear that Congress intended "or" in its inclusive sense, and that Section 3346(a)(2) constitutes a second, permissible period of service for Berryhill:

> Under new section 3346(a)(2), and subject to section 3346(b), an acting officer may serve more than 150 days if a first or second nomination is submitted to the Senate, and may serve while that nomination is pending from the date the nomination is submitted. The acting officer may serve even if the nomination is submitted after the 150 days has passed although . . . the acting officer may not serve between the 151st day and the day the nomination is submitted.

S. Rep. 105-250, reporting on Senate Bill 2176, "Federal Vacancies Reform Act of 1998," 1998 WL 404532, at *14 (July 15, 1998) (emphasis added). Notably, beyond the change from 150 days to 210 days, Section 3346 of Senate Bill 2176 contains the exact same language as Section 3346 of the FVRA. Compare S.2176, 105th Cong., § 3346, available at www.congress.gov/bill/105th-congress/senate-bill/2176/text, with 5 U.S.C. § 3346.

*Brooks*, 2022 WL 2834345, at *20.

Cases interpreting the application of Section 3346(a)(2) have also concluded that Section 3346(a)(2) serves as a spring-back provision. Cases addressing Section 3346(a)(2) in the setting of a claim for benefits under the SSA have found it to provide Berryhill with the authority to spring back into her role as Acting Commissioner. *See Williams v. Kijakazi*, No. 1:21CV141, 2022 WL 2163008, at *3 (W.D.N.C. June 15, 2022) (unpublished) (characterizing holding in *Brian T.D.* as "an outlier that conflicts with the plain text of the FVRA, nearly every other court to address the issue, as well as the views of the Executive Branch and the Legislative Branch – all of which agree that § 3346(a)(2) permits an acting official serving under the FVRA to serve during the pendency of a first or second nomination even when that nomination was submitted after the initial 210-day period for acting service

has expired"); *Thomas S.*, 2022 WL 268844, at *3 (unpublished) ("The FVRA contains a 'spring-back' provision that enabled Berryhill to resume her role as Acting Commissioner as of the date that [ ] Saul was nominated for Commissioner in April 2018."); *Reuter*, 2020 WL 7222109, at *15 (unpublished) ("Berryhill actually held the title of Acting Commissioner of Social Security twice. She first assumed the role on January 21, 2017 . . . . Immediately following the GAO[ Notice], [ ] Berryhill stepped down from her role as Acting Commissioner and continued to lead the agency from her [DCO] position of record . . . . [H]owever, on April 17, 2018, the President nominated [ ] Saul to be the next Commissioner of Social Security . . . . The FVRA contains a 'spring-back' provision that enabled Berryhill to resume her role as Acting Commissioner as of the date of [ ] Saul's nomination."); *Patterson*, 2018 WL 8367459, at *1 (unpublished) ("The FVRA contains a 'spring-back' provision that enabled Berryhill to resume her role as Acting Commissioner as of the date of [ ] Saul's nomination.").

Finally, the DOJ has, since at least 1999, interpreted Section 3346(a)(2) of the FVRA to constitute a spring-back provision:

> The [FVRA] incorporates a spring-back provision, which permits the acting officer to begin performing the functions and duties of the vacant office again upon the submission of a nomination, even if the 210-day period expired before that nomination was submitted. If the 210-day limitation period expires before the President has submitted a nomination, the restrictions in § 3348 of the Act, which bar anyone from serving in an acting capacity, become operative. If thereafter the President submits a nomination, an acting officer is again able to perform the functions and duties of the office as of the date the nomination is submitted.

> DOJ, Office of Legal Counsel, "Guidance on Application of Federal Vacancies Reform Act of 1998," 1999 WL 1262050, at *6-8 (Mar. 22, 1999) (emphasis added) (parentheticals omitted).

Like the DOJ, the GAO – the same agency that found a violation in Berryhill's service beyond 300 days after the resignation of Colvin, *see* GAO Notice, at 1 – also interprets Section 3346(a)(2) of the FVRA to provide spring-back authority to resume acting service upon a nomination to the Senate, *see* GAO, No. B-328888, "Violation of the 210-Day Limit Imposed by the Federal Vacancies Reform Act of 1998 — Department of Energy, Director of Office of Science," www.gao.gov/assets/b-328888.pdf, at 2 (Mar. 3, 2017) (reporting that the FVRA "contains a *spring-back provision* that allows an acting official to resume performing the duties of the office once a first or second nomination is submitted to the Senate for the period that such nomination is pending in the Senate" and thus that acting official *whose initial 210-days had expired "could resume her service as Acting Director . . . when the President submitted [a] nomination to the Senate*" (emphasis added)).

In sum, the plain language of Section 3346(a) of the FVRA makes clear that Section 3346(a)(2) provided authority for Berryhill to resume service as Acting Commissioner as of the date of President Trump's nomination of Saul for Commissioner on April 17, 2018. Further, the FVRA's legislative history, caselaw interpreting Section 3346(a)(2), and interpretations of that Section from the DOJ and the GAO all support the interpretation of Section 3346(a)(2) as a spring-back provision. As such, the Court finds that Berryhill lawfully ratified the SSA's ALJs' appointments as her own on July 16, 2018, and thus that Ortiz-Rivera's third issue on review fails as a matter of law.

V.   **CONCLUSION**

Based on the foregoing, the Commissioner's decision to deny Ortiz-Rivera's application for disability benefits is **AFFIRMED**, final judgment is entered in favor of the

Commissioner and against Ortiz-Rivera, and the Clerk of Court is directed to **CLOSE** this case.

An appropriate Order follows.

Dated: January 3, 2023

_s/ Karoline Mehalchick_
**KAROLINE MEHALCHICK**
**Chief United States Magistrate Judge**